UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA )
)
v. ) No. 3:05-00104
) Judge Echols
ELBERT GEORGE NICHOLS )

## MEMORANDUM

Presently pending before the Court is Defendant Elbert Nichols' Motion to Suppress (Docket Entry No. 15), to which the Government has responded in opposition.

## I. PROCEDURAL HISTORY

On June 2, 2005, a grand jury indicted Defendant on a charge of possessing a firearm, a .38 caliber revolver, after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) and 924. On July 13, 2005, Defendant filed the current Motion seeking to suppress evidence and statements taken by the police during the stop and search of his vehicle on September 9, 2004. The Court held a suppression hearing on September 6, 2005. The Defendant filed a post-hearing brief and the Government filed proposed findings of fact and conclusions of law.

## II. FACTS

On September 9, 2004, at approximately 1:15 a.m., Metropolitan Nashville Police Department Officer Aaron Wigginton was on routine traffic patrol on Illinois Avenue headed toward 51 $^{st}$ Avenue in Nashville, Tennessee. He observed a four-door Buick sedan parked on the side of the road and people standing near the car. As he

1

drove by, the individuals quickly walked away from the car into the shadow of a house. Their behavior attracted his attention. (Docket Entry No. 22, Suppression Hr'g Tr. at 8, 22, 43-44.)

Officer Wigginton contacted by radio a fellow patrol officer in the area, Yannick Deslauriers, and told him what he had just seen. Officer Wigginton gave Officer Deslauriers the car's license plate number and continued patrolling, trying to keep his eye on the car. Officer Wigginton and Officer Deslauriers passed each other on 51st Street, so Officer Deslauriers was also able to observe the car. Officer Deslauriers did not recognize anyone standing in the yard. Officer Wigginton turned around, and as he did so, he told Officer Deslauriers he thought he saw shadows moving from the house back to the car. Officer Deslauriers responded he did not think the individuals were moving back to the car because they saw him when he passed. He thought the people were going back toward the house. (Id. at 22, 44.)

Both officers stayed off the street for three to five minutes while Officer Deslauriers ran a check of the car license. That check revealed a current registration showing Elbert Nichols as the owner of the car. Officer Deslauriers had not met Elbert Nichols and did not know what he looked like. (Id. at 10, 16, 23, 44.) Officer Deslauriers decided to run the name through the warrant system on a different computer. Upon entering the name, "Elbert Nichols," the program immediately reported two outstanding robbery warrants on a black male. Officer Deslauriers knew there were two black men standing in the yard next to the car. He told Officer

2

Wigginton what he had learned and they decided to investigate the car "a little more." The officers had no information that the car had been involved in a robbery or any other crime. (Id. at 10, 23-24.)

The police computer program provided Nichols' "OCA number," which was assigned to him on a previous arrest by the Metropolitan Nashville police. (Id. at 10.) Officer Deslauriers ran the OCA number in the computer to request Nichols' mugshot. Because the computer was wireless, the mugshot loaded slowly on the screen and it did not immediately appear. (Id. at 13.)

Both officers headed back to the Buick's location and positioned themselves on either side, waiting for the car to leave. (Id. at 11.) Officer Wigginton was located at Illinois and Morrow and could not see the car. (Id. at 45.) Officer Deslauriers drove to the opposite end of Illinois around 51st Street, and sat around the corner where he could see the car in the darkness. (Id. at 13.)

Two to three minutes later, Officer Deslauriers saw the car's headlights come on and he advised Officer Wigginton the car was moving. (Id.) Because the car was pointed toward Officer Deslauriers, both officers assumed the car would move toward him. Instead, the car made an immediate U-turn and headed toward Officer Wigginton at the corner of Illinois and Morrow. Officer Wigginton met the Buick face-to-face at the stop sign. Officer Deslauriers' patrol vehicle was behind the car. The officers could see two men

3

in the car, but they did not know their identities.  (Id. at 11, 24, 46.)

Officer Wigginton asked Officer Deslauriers repeatedly if the mugshot of Elbert Nichols had appeared on his computer screen and was advised it had not.  The car made a right turn onto Morrow.  As it did so, the color mugshot appeared on Officer Deslauriers' computer screen.  He was able to take "a good look" at the mugshot. At the same time, Officer Wigginton turned left behind the car at the corner and both officers activated their blue lights.  Officer Deslauriers pulled up behind Officer Wigginton.  (Id. at 11-13, 24, 26, 46.)

Both uniformed officers approached the car with guns drawn. Officer Wigginton did not see the mugshot.  He walked toward the driver's side of the car and Officer Deslauriers walked to the passenger side.  It appeared that the passenger was trying to reach to the driver's side, grab the gear shift on the steering column, put the car into drive, and press the gas pedal.  The passenger was yelling, "stomp it, stomp it" to the driver.  In view of this behavior, the officers used more care in approaching the car. Officer Deslauriers reached the passenger side of the car at the post between the two windows.  The passenger looked forward and then back over his shoulder at Officer Deslauriers, who recognized him as Elbert Nichols.  Officer Wigginton asked Officer Deslauriers which one was Elbert Nichols.  Officer Deslauriers pointed to the passenger.  The officers told Defendant to "stop that," and he stopped trying to put the car into drive.  The officers gave the

4

men commands not to run.  The driver held his hands out the window and said, "No, no, I am not going to.  I am not going to."  Id. at 13-14, 25, 27-28, 46-47.)

The officers waited for backup to arrive and then they removed the two men from the car.  Officer Deslauriers took Defendant into custody, handcuffed him, and placed him in the back seat of his patrol car.  He advised the Defendant he was arrested for robbery warrants and gave him the Miranda rights.  Officer Deslauriers asked the Defendant if he understood his rights, and Defendant responded he understood.  Defendant was not asked to sign a written waiver of his Miranda rights, even though the Metropolitan Nashville Police Department makes written waiver forms available to its officers.  Defendant did not expressly state that he waived his Miranda rights.  ( Id. at 37-38.)  Officer Deslauriers asked Defendant if he had any question about his rights and Defendant responded "no, he didn't, and it wasn't him."  ( Id. at 15.) Officer Deslauriers showed Defendant the mugshot on the computer, and Defendant said, "that is not me."  Officer Deslauriers then closed the door of the patrol car.  (Id. at 14-15, 28.)

Officer Wigginton did not talk to Defendant "much at all." (Id. at 49.)  He asked Officer Deslauriers if Defendant was "mirandized," to which Officer Deslauriers responded, "Yes.  We are having some trouble deciding whether that is him or not, even though he is looking at the mugshot.  He keeps saying that is not him."  (Id. at 49.)  Officer Wigginton stuck his head in the car

Case 3:05-cr-00104   Document 28   Filed 10/04/05   Page 5 of 22 PageID #: 140

and said, "That looks like him to me." Defendant responded, "No, that is not me." (Id.)

Officer Deslauriers searched the passenger compartment of the car and found a loaded Smith & Wesson .38 caliber handgun in the locked glove box in front of the passenger seat. He opened the glove box by using a key he found on a key ring inside the car. He also discovered a bandana in the car. Officer Deslauriers did not ask Defendant for permission to search the car, and he did not tell Defendant he could refuse the search, which lasted "[a] couple minutes. Not very long." (Id. at 41.)

Officer Wigginton did not participate in the search. He called Detective Chastine, of the armed robbery division, to the scene. (Id. at 47.) Based on the evidence found and the fact that Defendant was wanted for questioning in forty-one (41) robberies, the car was towed from the scene, impounded and held for the robbery division pursuant to the Metropolitan Nashville Police Department's General Order for Vehicle Impoundment.[1] (Def. Exs. 1 & 3.) Defendant was not permitted to ask the driver or someone else he knew to pick up the car. The driver wanted nothing to do

---

[1]During the suppression hearing, the Defendant sought discovery of a "hold" Form 234. The Government responded that it did not have such a "hold" form in its possession. The Court ordered the Government to obtain the officer's file and to disclose any such document to the defense. (Docket Entry No. 22, Suppression Hr'g Tr. at 36-37.) In their post-hearing filings, neither party mentions the outcome of that discovery, and Defendant does not contend there is any issue remaining with regard to discovery of the "hold" form.

with the car, and although he was initially detained, he was later allowed to leave. (Suppression Hr'g Tr. at 15-19, 29-33, 48, 54.)

After finding the gun, Officer Deslauriers returned to the patrol car where Defendant was sitting. He advised the Defendant that he had located a gun and started to ask the Defendant standardized questions from a "gun questionnaire," such as, whether the gun belonged to him, whether he knew it was stolen, where he got it, and how much he paid for it. (Id. at 16; Def. Ex. 2.) At first, Defendant continued to state that he was not Elbert Nichols, so Officer Deslauriers turned his attention to completing an arrest report. After some general conversation about the paperwork that lasted several minutes, Defendant admitted he was Elbert Nichols, but claimed the robbery warrants were a mistake. Officer Deslauriers testified, "Finally he just got tired, I assume." (Id. at 16-17, 38-39.) The officer checked the status of the gun in the police computer and learned it had been stolen from the Metropolitan Nashville Police Department in 1992. Defendant denied he knew the gun was stolen and stated he purchased it on the street for $100. Defendant also said he did not know what kind of gun it was, but he kept it for self-protection. Defendant did not tell Officer Deslauriers at the scene of the arrest that he did not wish to speak. Defendant did not sign the gun questionnaire. (Id. at 17-19.)

### III. **ANALYSIS**

Defendant Nichols now asserts that (1) the officers initiated the investigation based on his race in violation of the Equal Protection Clause; (2) his seizure was not based on reasonable

7

suspicion; (3) the search of the locked glove box in the car exceeded the scope justified by even a lawful arrest; (4) the police failed to follow their standard procedures when impounding his car, so there could not have been a lawful inventory search; (5) the police violated his Miranda rights by continuing to question him after he invoked his right to silence; and (6) the Government failed to prove that Defendant knowingly and voluntarily waived his Miranda rights. He contends the exclusionary rule requires suppression of the gun and the statements the police obtained from him after his arrest.

## A. The Equal Protection Clause was not violated

According to Defendant, Officer Deslauriers initiated investigation of Defendant twice: when he decided to check the Buick's license plate and when he decided to run the name "Elbert Nichols" in the warrants database. Defendant believes circumstantial evidence supports the inference that his race was the only reason why Officer Deslaurier made those two decisions. Officer Deslauriers did not recognize the black men standing near the Buick, he knew nothing about the Buick, and he did not see the men engaged in any illegal activity. Thus, nothing about the people, car or location served as an objective, nondiscriminatory reason to initiate investigation. "Officer Deslauriers saw only that the men were 'black guys' in a predominantly black neighborhood." (Docket Entry No. 25, Defendant's Post-Hearing Brief at 6-7.) He suggests the investigative steps Officer Deslauriers took were unusual, and it is reasonable to conclude that, had the men been white and standing in a predominantly white

8

neighborhood, Officer Deslauriers would not have decided to search the car's registration or run a warrants check against the owner. See United States v. Avery, 137 F.3d 343, 355 (6th Cir. 1997), and United States v. Navarro-Camacho, 186 F.3d 701, 711 (6th Cir. 1999) (Moore, J., concurring).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" Moreover, citizens are entitled to equal protection of the law at all times. Avery, 137 F.3d at 355. Thus, "[i]f law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, *without more*, then a violation of the Equal Protection Clause has occurred." Id. (emphasis added).

The Defendant must prove the decision maker in his case acted with discriminatory purpose. Id. (citing McCleskey v. Kemp, 481 U.S. 279, 292 (1987)). He can do this by producing direct evidence of discrimination, or by drawing inferences "from valid relevant statistical evidence of disparate impact or other circumstantial evidence." Id. The Defendant must establish a prima facie case that race was a motivating factor in the challenged action, and having done that, the Government must then rebut the prima facie case by articulating a race-neutral reason for its action, or by identifying a compelling governmental interest necessitating its action. Id. at 356. The Defendant retains the ultimate burden to prove race discrimination. Id.

9

Defendant did not present any statistical evidence of disparate impact based on race. He relies solely on the circumstantial evidence that Officer Deslauriers is white and he was patrolling in a predominantly black neighborhood to contend that race must have been the motivating factor for investigation. Even if this slim allegation constitutes a prima facie case, and the Court does not believe it does, the Government has nonetheless articulated a race-neutral reason for the police action taken, as well as a compelling governmental interest necessitating the action.

In explaining why this is true, it is important to note first that Defendant challenges the actions of Officer Deslauriers, and not those of Officer Wigginton. Officer Deslauriers' conduct cannot be considered in a vacuum, however, particularly when the Court must evaluate the totality of the circumstances. The knowledge of several police officers involved in an investigation may be considered collectively if there is a direct investigative link between them. <u>United States v. Pasquarille</u>, 20 F.3d 682, 689 (6th Cir. 1994). The Court is permitted to consider both officers' observations and the knowledge communicated between them in determining under the totality of the circumstances whether the officers had reasonable suspicion to investigate further. <u>Id.</u>

Officer Wigginton observed the men standing near the parked Buick as he drove by in his marked police vehicle. The men aroused his suspicion when, upon seeing him, they quickly walked away from the Buick and into the shadows of a house where he could not see them. Within minutes, Officer Deslauriers also passed the house in

10

his marked police vehicle and the men responded similarly to him. The individuals' behavior prompted Officer Deslauriers to check the license plate number given to him by Officer Wigginton. Having learned that "Elbert Nichols" was the registered owner of the Buick, Officer Deslauriers then ran the name through the warrants database as a matter of routine police practice and realized the person known as "Elbert Nichols" was wanted on two robbery warrants.

The officers' investigative work is like that undertaken in Terry v. Ohio, 392 U.S. 1, 4 (1968). In that case two men standing on a corner in downtown Cleveland attracted the attention of Officer McFadden, who was on foot patrol. The officer had never seen the men before, and "he was unable to say precisely what first drew his eye to them" except that when he looked over, "they didn't look right to me at the time." Id. at 5. In explaining his decision to investigate further, the officer could point only to his years of police experience and his routine habits of observing people. Id.

The evidence in this case supports the conclusion that the same instincts and observation habits which raised the suspicion of Officer McFadden in Terry are the same instincts and observation habits which raised the suspicion of Officers Wigginton and Deslauriers. See also United States v. Marxen, 410 F.3d 326, (6th Cir. 2005) (noting officer's specialized training and experience may permit him to make inferences from and deductions about

11

cumulative information available to him that might elude an untrained person).

Police officers who take note of suspicious occurrences and investigate them are discharging a compelling governmental interest in effective crime prevention and detection. Terry, 392 U.S. at 22. While separate observed acts themselves may seem innocent, when taken together, the acts may warrant further investigation. Id. And the crux of the Terry case was "not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation." Id. at 23.

The officers' suspicion that the men near the Buick tried to avoid police scrutiny is a race-neutral reason for further police investigation to determine if criminal activity was afoot. Moreover, the officers' discharge of the compelling governmental interest in detecting and preventing crime motivated them to investigate further. Thus, the Government sufficiently rebutted any prima facie case made by Defendant that the officers acted solely and improperly on the basis of Defendant's race. See Avery, 137 F.3d at 356. Defendant did not produce any other evidence tending to show the officers' race-based animus in order to carry his ultimate burden to prove discrimination based on race. See id. Thus, his Fourteenth Amendment Equal Protection Claim is without merit and it is denied.

12

**B. The police had reasonable suspicion for the stop**

In <u>United States v. Hensley</u>, 469 U.S. 221, 223 (1985), the Supreme Court held the Fourth Amendment permits police officers, in appropriate circumstances, to conduct a <u>Terry</u> stop if they have a reasonable suspicion, grounded in specific and articulable facts, that the person encountered is wanted in connection with a completed felony.[2] Defendant contends Officers Wigginton and Deslauriers lacked a reasonable suspicion that he was one of the two men riding in the Buick. Thus, he claims their stop of the vehicle violated the Fourth Amendment.

In <u>Hensley</u>, 469 U.S. at 228, the Supreme Court noted that certain differences between imminent crimes and completed crimes factor into the balance when deciding if a <u>Terry</u> stop was reasonable. A "stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity." <u>Id.</u> Exigent circumstances which require a police officer to act before a crime is committed are not necessarily as pressing after a crime is committed. <u>Id.</u> "Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law." <u>Id.</u> And officers who make a stop to investigate a completed crime may have "a wider

---

[2]Where that suspicion is grounded on a "wanted flyer" or bulletin disseminated to police officers, the stop is reasonable if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying the stop. <u>Id.</u> at 233.

range of opportunity to choose the time and circumstances of the stop." Id. at 228-229.

In spite of these differences between imminent or ongoing and completed crimes, police who are trying to locate a person suspected of involvement in a past crime may "briefly stop that person, ask questions, or check identification in the absence of probable cause" to arrest. Id. at 229. This promotes the "strong governmental interest in solving crimes and bringing offenders to justice." Id. Otherwise, investigation might be hindered and the suspect may be allowed to flee and remain at large. Id. Where past crime involved a threat to public safety, like the robbery crimes at issue here, there is a public interest in solving the crime and detaining the suspect as quickly as possible. Id.

In this case, the police officers confirmed that the Buick was registered to "Elbert Nichols" and that he was wanted on two outstanding robbery warrants. Thus, the officers established a direct connection between the suspected robber and the Buick they kept in sight. The officers knew that "Elbert Nichols" was black, and two black men were riding in the Buick. The officers justifiably wondered whether Nichols was one of the men in the car. While Officer Deslauriers attempted to obtain Nichols' mugshot, the men continued to act suspiciously. The driver made a U-turn in front of Officer Deslauriers and drove in the opposite direction. Under Hensley, 469 U.S. at 229, the officers had authority, based on their reasonable suspicion, ground in specific and articulable facts, to briefly stop the car and check identification to

14

determine if Nichols was, in fact, in the car.  See United States v. Roach, 958 F.2d 679, 682 (6th Cir. 1992).  See also Marxen, 410 F.3d at 332 (observing Terry stop is permissible where police have reasonable suspicion that vehicle stop may produce evidence of a past crime, citing Hensley).

Defendant relies on United States v. Hudson, 405 F.3d 425 (6th Cir. 2005), to argue that the police officers were required to identify him positively before effectuating the traffic stop.  But Hudson involved an anonymous tip to law enforcement that a person connected to a suspect for whom robbery warrants were outstanding would arrive for work at a certain place at a certain time in a certain type of vehicle.  Id. at 428.  Although the police officer testified the tip also included information that the suspect would be traveling in the car, the officers' report that was composed shortly after receipt of the tip did not mention any prediction that the suspect would be in the car.  Id.  The case turned on whether the tip, the police officer's attempt to corroborate the tip, and his own knowledge of the relationship between the suspect and the driver of the vehicle was together sufficient to make out a reasonable suspicion that when the car arrived at the appointed place, one of the passengers would be, in fact, the suspect.  Id. Under the specific facts of the case, the Sixth Circuit concluded that reasonable suspicion did not exist.  Id. at 433-434.

The court explained that in cases following Hensley where the Sixth Circuit sustained Terry stops of people suspected of past criminal activity, it had done so "on the strength of identifying

15

facts specifically linked to the suspect as an individual, to the suspect's location, *or to the suspect's vehicle*." Id. at 435 (emphasis added). See e.g. United States v. Thomas, 11 F.3d 620, 627-628 (6th Cir. 1993) (upholding stop where officers had physical description of defendant and his truck and officers learned truck was registered to defendant). In Hudson, none of those factors was present. Here, however, the officers directly linked the suspect, Elbert Nichols, to the Buick under surveillance by running the car license plate number and identifying him as the registered owner of the car before they effectuated the Terry stop. The mugshot that displayed on the computer screen as the stop was being made simply allowed Officer Deslauriers to identify Nichols more quickly.

Defendant also cites United States v. Green, 111 F.3d 515, 519-520 (7th Cir. 1997), but in that case the only information the Government offered to support the stop was that the officer had previously seen the defendant's car parked in front of the home of a man wanted under a federal arrest warrant. Here, the police officers linked the person wanted for arrest to a particular vehicle, the Buick, as permitted by Thomas.

The Government cites a case similar to this one, United States v. Hunt, 156 F.3d 123, 1998 WL 432475 (6th Cir. 1998) (unpublished). There the Sixth Circuit upheld a Terry stop where the "officers did not engage in a stop of Defendant's vehicle until after the computer check revealed that the owner of the vehicle was wanted in a federal bank robbery." Id. at *3. Moreover, the court stated that, while the defendant might "disapprove of any acts which led

16

the officers to turn around, follow Defendant, and run a check on his vehicle[,] the officers do not need specific and articulable facts to justify their suspicion to run a check on Defendant's vehicle--the suspicion alone was sufficient." _Id._ The officers' confirmation of their suspicion through the records check gave rise to specific and articulable facts justifying the stop of the car to verify the Defendant's identity. _Id._ Upon verification, the officers had probable cause to arrest the Defendant on the warrants. _Id._ The Court concludes the officers in this case properly effectuated a _Terry_ stop of Defendant's vehicle.

**C. Unlocking the glove box did not exceed the scope of lawful search**

Officer Deslauriers had authority to search the passenger compartment of the Buick, including closed containers within it, as a search incident to Defendant's arrest on the robbery warrants to ensure the officers' safety and to preserve evidence, even though Defendant Nichols had been separated from the car. _See_ _New York v. Belton_, 453 U.S. 454, 461 (1981); _Michigan v. Long_, 463 U.S. 1032, 1034, 1049 n.14 (1983); _Thornton v. United States_, 541 U.S. 615, 124 S.Ct. 2127, 2131 (2004); _Thomas_, 11 F.3d at 628. Officer Deslauriers complied with the Fourth Amendment when he used a key to unlock the glove box where he found the loaded gun. _See_ _United States v. Woody_, 55 F.3d 1257, 1269-1270 (7th Cir. 1995) (holding search of locked glove compartment incident to arrest was valid even though defendant sat handcuffed in back seat of patrol car); _United States v. Holifield_, 956 F.2d 665, 668-669 (7th Cir. 1992)

17

(same).  Defendant's contention that the search of the glove box exceeded the scope of a valid Fourth Amendment search is rejected.

**D.  The police followed their own vehicle impound procedures**

Defendant next asserts that the police officers violated the Metropolitan Nashville Police Department General Order on impounding vehicles and therefore, the inevitable-discovery rule does not render the pistol admissible.  Because the Court has already held the gun was lawfully discovered pursuant to a search incident to arrest, the Court need not develop this issue at length.

It is sufficient to say that the police officers' testimony establishes that a robbery detective was called to the scene of the arrest, the detective directed that the car should be impounded and held for further investigation of outstanding robberies in which Defendant was a suspect, and Officer Wigginton filled out the Vehicle Towing Report ("VTR") (Def. Ex. 2) and had the car impounded and held for the robbery division.  The Defendant properly was not informed that he could take "alternative action" to have his car picked up by some one else because the car itself was evidence.  (Def. Ex. 3, General Order at 4, 12 (permitting impoundment of vehicle to preserve evidence).)  The contention that the impoundment violated police policy is without merit.

**E.  Defendant's <u>Miranda</u> rights were not violated**

Finally, Defendant contends he did not knowingly, voluntarily, and expressly waive his <u>Miranda</u> rights at the scene of the arrest and he indicated his unwillingness to answer police questions by

refusing to admit his identity. Consequently, all police questioning should have stopped, and the statements made by the Defendant are inadmissible.

Because Officer Deslauriers did not obtain Defendant's express waiver of his <u>Miranda</u> rights in writing or orally, the Court must presume that the Defendant did not waive his rights. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). The Court may not lightly infer a waiver, and the Government carries the heavy burden to show that Defendant's waiver can be clearly inferred from his words and actions. <u>Butler</u>, 441 U.S. at 373; <u>United States v. Bentley</u>, 726 F.2d 1124, 1128 (6th Cir. 1984). The Court believes the Government carried its burden here.

After informing Defendant of his <u>Miranda</u> rights, Officer Deslauriers asked Defendant if he had any questions about his rights and Defendant responded that he did not, but he denied his identity. Officer Deslauriers showed Defendant the mugshot on the computer, and Defendant said, "That is not me." Officer Deslauriers then closed the door of the patrol car and searched the Buick. (<u>Id.</u> at 14-15, 28.)

Upon locating the gun, Officer Deslauriers advised the Defendant of its discovery and started to ask the Defendant standardized questions from a "gun questionnaire," such as, whether the gun belonged to him, whether he knew it was stolen, where he got it, and how much he paid for it. (<u>Id.</u> at 16; Def. Ex. 2.) Defendant's response was to continue to deny his identity. The

19

Court finds that Defendant's repeated denials of his identity were not refusals to answer all police questions. Rather, Defendant wished to, and did, communicate affirmatively with the police officers by making statements to them which he believed furthered his self-interest. Defendant knew he could remain silent and that he could request an attorney, but he did neither.

Officer Deslauriers turned his attention to completing an arrest report. He testified that Defendant willingly engaged in general conversation with him about the paperwork that lasted several minutes. In the course of that conversation, Defendant eventually admitted that he was Elbert Nichols, but he claimed the robbery warrants were a mistake. Again, Defendant manifested a desire to communicate with the officer in an effort to convince him that he should be released.

Officer Deslauriers testified, "Finally he just got tired, I assume." ( Id. at 16-17, 38-39.) Defendant suggests that this remark, made at the suppression hearing in response to a question by the Court, is evidence that the officer coerced Defendant to make incriminating statements at the scene of the arrest. No such weight can be placed on the officer's comment.

At the time of the arrest, Defendant demonstrated his willingness to answer police questions. The officer checked the status of the gun in the police computer and learned it had been stolen from the Metropolitan Nashville Police Department in 1992. Defendant denied he knew the gun was stolen and stated he purchased it on the street for $100. Defendant also said he did not know

20

what kind of gun it was, but he kept it for self-protection. Defendant did not tell Officer Deslauriers at the scene of the arrest that he did not wish to speak. (<u>Id.</u> at 17-19.) Defendant later invoked his right to remain silent because an officer wrote at the bottom of the gun questionnaire: "subject refused to be interviewed any further when he was transported to the robbery office." (Def. Ex. 2.)

The evidence before the Court does not indicate that Officer Deslauriers coerced the Defendant to make incriminating statements at the scene of the arrest in violation of <u>Miranda</u>. <u>See</u> <u>United States v. Hurst</u>, 228 F.3d 751, 760 (6th Cir. 2000) (observing any statement given freely and voluntarily without any compelling influences is admissible). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the [government's] intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." <u>Moran</u>, 475 U.S. at 422-423.

The Court finds, under the totality of the circumstances presented, that Defendant understood his <u>Miranda</u> rights and knew that he could stand on those rights; Officer Deslauriers did not coerce Defendant to make incriminating statements; Defendant conveyed, by his words and actions that he waived his right to remain silent at the scene of the arrest; and the incriminating statements Defendant made were the product of his knowing, free, and voluntary choice to speak to law enforcement. <u>See</u> <u>United</u>

21

States v. Stark, 609 F.2d 271, 273 (6th Cir. 1979). Accordingly, the statements will not be suppressed.

### IV.  CONCLUSION

The police officers' decision to investigate was based on suspicious behavior and the compelling governmental interest in crime detection and prevention.  Defendant did not prove that investigative decisions were based on Defendant's race.  Thus, no Equal Protection violation has been shown.

The Terry stop of Defendant's vehicle was lawful under Hensley, and the officers had probable cause to arrest Defendant based on the outstanding robbery warrants.  The search of the passenger compartment of the car, including the locked glove box, was lawful as a search incident to Defendant's arrest.  Defendant was advised of his Miranda rights and, through his words and actions, impliedly waived his right to remain silent at the scene of the arrest.  Thus, the gun and Defendant's incriminating statements are admissible in evidence.  The Motion to Suppress shall be DENIED.

An appropriate order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

22